IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

```
UNITED STATES OF AMERICA      :
                              :
          vs.                 : Case Number: AW-09-CR-0265
                              :
                              :
WILSON LEE GARRETT, JR.       :
                              :
     Defendant                :
```

### CONSOLIDATED MOTION *IN LIMINE* AND MEMORANDUM

COMES NOW, Wilson Lee Garrett, Jr., by and through his attorney, James N. Papirmeister, Esq., of the Law Offices of James N. Papirmeister, and hereby respectfully moves *in limine* to preclude the Government from its use of drug dog sniff evidence in the trial in this case, as well as its purported Rule 404(b) evidence, both of which will be more fully set out below.

### PROCEDURAL HISTORY

Wilson Lee Garret, Jr. was originally indicted in this case on May 18, 2009, with two (2) charges.  The first count charged that in the middle of 2006 through February, 2007, Mr. Garrett Conspired to Possess with Intent to Distribute five (5) kilograms or more of cocaine.  The second count charged that Mr. Garrett on March 18, 2009, Attempted to Possess with Intent to Distribute 500 grams or more of cocaine.

As the Court knows, Robert Bonsib, Esq. originally represented Mr. Garrett from the inception of the case. When it was revealed that there was a potential conflict in that Mr. Bonsib represented Sgt. Cline, one of the officers involved in the March 18, 2009 traffic stop, Mr. Bonsib eventually agreed to withdraw from the case and the undersigned assumed representation of Mr. Garrett.

The case then came on for a motions hearing starting in December 2010, and concluding in February, 2011, with the Court denying Mr. Garrett's motion to suppress the fruits of the March 18, 2009 traffic stop ($32,000 in cash) as well as the May 15, 2009 search warrant of Mr. Garrett's home. Subsequent to the Pre-Trial motions hearing in February, 2011, and in preparation for the February 22, 2011 trial, the undersigned counsel delivered several anticipated defense exhibits it wanted to introduce at trial to the U.S. Attorney's Office on Friday, February 18, 2011. After the Government received the defense exhibits, the Government obtained a search warrant for Mr. Garrett's home, and executed it that same Friday evening.

It should be noted that at the motions hearing of February 7, 2011, the Court asked Assistant United States Attorney Barbara Skalla, who at that time was the lead counsel for the Government on this matter, if there was going to be any Rule 404(b) evidence, to which Ms. Skalla replied there would not.

As a result of its interpretation of the defense exhibits it received on February 18, 2011, and possibly the examination of the fruits of the search warrant conducted on that same day,

the Government filed a Motion *In Limine* on Sunday, February 20, 2011. When the parties appeared for the scheduled trial date on February 22, 2011, the flurry of activity that had ensued within the few days before trial was made known to the Court, and appropriately, the Court continued the trial so that the various motions generated by the parties' activities could be properly addressed.

In addition, the Government also gave notice in February, 2011, that it intended to call as witnesses at trial the handlers of two (2) drug dogs. One was to testify as to the March 18, 2009, traffic stop, that the drug dog of Detective Scarlotta, "Prospect", alerted positively on the dashboard of Mr. Garrett's car and on the cash seized from him at said traffic stop. The other handler is to testify that another drug dog hit in several places in Mr. Garrett's residence during the search warrant which was executed on May 15, 2009. These so-called positive drug dog alerts are now being offered by the Government as substantive evidence in its case in chief that there was purportedly cocaine in or about Mr. Garrett's dashboard and on the currency at the March 18, 2009 traffic stop and at five (5) different places in his residence at the May 15, 2009 search warrant execution.

Also in February, 2011, the Government conducted a new chemical test on evidence that it seized back on May 15, 2009, at the time of the execution of the search warrant. That new chemical test was on a so-called "Ion Scan Sample Trap" and then "Sample Vacuumed from black bag". The reports we received

3

in the discovery indicate that the Ion Scan Sample Trap from the vacuumed debris apparently recovered from a black bag at the May 15, 2009 search warrant, was actually scanned back on May 27, 2009. However, on February 14, 2011, the Government tested that Ion Scanned Sample and their test revealed that said sample was positive for cocaine residue.

On March 21, 2011, the Government obtained a superceding indictment of Wilson Lee Garrett, Jr., incorporating in counts 1 and 2, the same two (2) counts with which he was previously indicted, and now adding counts 3 and 4. Count 3 now charges Wilson Lee Garrett, Jr., with Possession with Intent to Distribute Cocaine on May 15, 2009, which was the date of the execution of the search warrant at his home. Count 4 charges Mr. Garrett with Possession of Three Firearms in Furtherance of a Drug Trafficking Crime on May 15, 2009. Also, there is a forfeiture allegation related to the firearms and ammunition therein.

The Government and defense then resolved two major issues prior to the scheduled April 8, 2011 motions hearing. By letter submitted April 11, 2011, the Court was informed that the defense would not move to suppress the fruits of the February 18, 2011 search warrant of Mr. Garrett's home. Further, the Government would withdraw its Motion In Limine as to the admission of the defense exhibits. Both of theses resolutions had certain stipulations attached to them which are recited in the April 11, 2011 correspondence.

Finally, on April 12, 2011, the undersigned received an e-mail from the Government with an attached letter dated April 7, 2011, outlining what purports to be Rule 404(b) evidence. "Also, we are providing notice that the Government may introduce evidence related to: (1)the defendant's drug dealing outside of the conspiracy; (2) the defendant's commission of bank and wire fraud; (3) the defendant's tax evasion; and (4)the defendant's prior possession of a firearm at a military base." <u>Id</u>. This Consolidated Motion *In Limine* and Memorandum addresses the issue as to whether or not the Government should be allowed to present evidence of the drug dog alerts, either as to the March 18, 2009, traffic stop or the May, 15, 2009, search warrant of Mr. Garrett's residence. Secondly, this Motion addresses whether and to what extent the Government should be allowed to use its purported Rule 404(b) evidence.

## FACTUAL BACKGROUND

Although this Court at motions hearings has heard a considerable amount of testimony from Special Agent Morollo regarding purported drug conversations between the CS and Mr. Garrett, and recitations of a prior seizure of a large amount of cocaine in February, 2007, the connection of Wilson Garrett, Jr. to drugs in this case is tenuous. The Government is going to offer the testimony of an admitted large-scale drug dealer, named David Zellars, who has ties to a Mexican drug cartel and

has admitted to dealing in literally millions of dollars worth of cocaine trafficking over ten (10) years. In the chronology of facts in this case, the first significant incident occurred on February 13, 2007, when Mr. Zellars was stopped by the police in a caravan of three (3) vehicles, one of which was found to contain 70 kilos of cocaine and being driven by two (2) individuals named Jesus Rodriguez and David Tirado-Gaspar. The Government wants to put into evidence the pictures and drug reports showing this exorbitant amount of cocaine as to which Wilson Lee Garrett, Jr. has absolutely no connection. It is basically irrelevant. In fact, Wilson Garrett Jr.'s name, by admission of Special Agent Morollo, did not even surface as to the February 13, 2007 seizure, until almost two (2) years later in December 2008, when Mr. Zellars began cooperating with the Government. According to the letter dated February 14, 2011, that the Government provided to the undersigned, agents met with Mr. Zellars on February 4, 2009. Special Agent Conti asked Mr. Zellars if Wilson Garrett would have received any cocaine from the shipment of cocaine that was seized on February 13, 2007. The response was "Zellars stated that more than likely he would have received something," referring to Mr. Garrett. Id. The only other evidence that the Government has as to a purported connection of Mr. Garrett to this February 13, 2007 seizure of which we are aware, is a phone record indicating that two (2) calls of 0:00.00 (hours, minutes, seconds) duration, were placed by Mr. Zellars to Mr. Garrett, at 10:21 am on February 13, 2007, twelve (12) hours before the

traffic stop, which Mr. Garrett never received or apparently knew of. With Zellars stating at most that Mr. Garrett "more than likely would have received something", that is at best a very tenuous, if not dubious connection. It lacks any concrete assertion that Mr. Garrett had any part of that large seizure. It really just states a possibility and nothing more.

The Government will offer Mr. Zellars as its primary cooperator witness who will purport to say that he had engaged Mr. Garrett in numerous drug transactions prior to the February 13th seizure. Interestingly, the Statement of Facts in the Plea Agreement for Mr. Zellars mentions seventeen (17) people who conspired with him to traffic in cocaine and none of those persons includes Wilson Lee Garrett, Jr.

The next piece of evidence the Government has in this case is a series of phone conversations between February 9, 2009, and April, 2009, within which time frame was the traffic stop on March 18, 2009. The traffic stop resulted in the seizure of $32,000.00 from Wilson Garrett. There was no cocaine found in this traffic stop.

The last significant item in the Government's case is the May 15, 2009 search warrant where cocaine was purportedly found in a jacket pocket of a black jacket found in a closet adjacent to a bedroom in Mr. Garrett's home. The net weight of this amount of cocaine hydrochloride, or powdered cocaine, was 3.4 grams with the amount of actual drug listed in the Chemist's report as 2.6 grams. Of course there was the seizure of three (3) firearms, over $7,000.00 in cash, a money counter, and

several cell phones.   It was not until the March, 2011, superseding indictment, however, that Mr. Garrett was charged with Possession with Intent to Distribute Cocaine on May 15, 2009, or with any firearms purportedly used in drug trafficking from May 15, 2009.

Thus, the sum total of drugs that the Government actually has in this case, that was found in some property of or belonging to Wilson Lee Garrett, Jr., was approximately three (3) grams of powdered cocaine.   Mr. Garrett denies any knowledge or possession of that cocaine or any involvement with cocaine in this case.   All other linkages of purported cocaine and cocaine dealing and Mr. Garrett come through drug dealing informants the Government intends to call as its witnesses.

## DRUG DOG EVIDENCE IS ONLY FOR PROBABLE CAUSE

The undersigned takes no issue in this case with the use of drug dog evidence for purposes of probable cause determinations.   It is a well-settled and widely used basis for determining probable cause for the presence of drugs in a certain location based on the alert of a certified drug dog with the proper canine handler.   Mr. Garrett does take great issue, however, with this evidence being put before a jury as substantive evidence of a person's possession of drugs or the presence of drugs in an area in question.   This evidence is so fraught with unreliability that for a jury to hear that a drug dog is "certified" and that the handler is a "certified drug

dog handler", gives far too much credibility to evidence which courts all over the country have found highly questionable. Again, we are not talking about probabilities here, we are talking about a person's life and proof beyond a reasonable doubt. We are also not talking about a chemist, who is a scientist and has the requisite training and experience and uses scientific methods generally accepted in the relevant scientific community, and uses equipment the testing and results of which can be replicated. We are instead, talking about an animal who has admittedly a highly keen and extraordinary sense of smell, but who is nevertheless an animal that cannot be cross-examined. We are then talking about a police officer who has some special training in the use of this animal who claims to be an expert in interpreting physical movements and reactions of the animal.

There is a relative dearth of case law throughout the country in both the Federal and State courts on the use of this evidence as substantive evidence in a criminal trial, as distinguished from its use for probable cause determinations. The cases that do seem to address the use of drug dog evidence as substantive evidence in a jury trial, appear to strongly argue against the admissibility of such evidence at a criminal trial. There are literally thousands of cases throughout the Federal and State courts, and hundreds or treatises, dealing with the admissibility and reliability of drug dog evidence for the purpose of determining probable cause. Even the cases which address its use for purposes of probable cause are far

from uniform in their holdings as to its admissibility, and the reliability of this type of evidence at all.  The lack of a clearly affirmative decision warranting the use of drug dog sniff evidence as substantive evidence in a criminal case may be explained by the fact that its use even in the probable cause context is so problematic.

In the Supreme Court's decision in <u>Illinois v. Caballes</u>, 543 U.S.405(2005), upholding the use of a narcotics detection dog during a lawful traffic stop to sniff the exterior of the motorist's vehicle as not infringing on the motorist's Fourth Amendment rights, Justice Souter provided a compelling dissent.

> The infallible dog, however, is a creature of legal fiction.  Although the Supreme Court of Illinois did not get into the sniffing averages of drug dogs, their supposed infallibility is belied by judicial opinions describing well-trained animals sniffing and alerting with less than perfect accuracy, whether owing to errors by their handlers, the limitations of the dogs themselves, or even the pervasive contamination of currency by cocaine. See, *e.g.*, <u>United States v. Kennedy</u>, 131 F.3d 1371,1378 (C.A.10 1997)(describing a dog that had a 71% accuracy rate); <u>United States v. Scarborough</u>, 128 F.3d 1373, 1378, n. 3 (C.A. 10 1997) (describing a dog that erroneously alerted 4 times out of 19 while working for the postal service and 8% of the time over its entire career); <u>United States v. Limares</u>,269 F.3d 794, 797(C.A.7 2001)(accepting as reliable a dog that gave false positives between 7% and 38% of the time); <u>Laime v. State</u>,347 Ark. 142, 159, 60S.W.3d 464,476 (2001)(speaking of a dog that made between  10 and 50 errors); <u>United States v. $242,484.00</u>, 351 F.3d 499, 511 (C.A.11 2003) (noting that because as much as 80%  of all currency in circulation contains drug residue, a  dog alert "is of little value"), vacated on other grounds by rehearing en banc, 357 F.3d 1225 (C.A.11 2004); <u>United States v. Carr</u>, 25 F.3d 1194, 1214-1217 (C.A.3 1994) (Becker, J., concurring in part and dissenting in  part)("[A]substantial  portion  of  United States  currency...is  tainted  with  sufficient  traces of

10

> controlled substances to cause a trained canine to alert to their presence"). Indeed, a study cited by Illinois in this case for the proposition that dog sniffs are "generally reliable"shows that dogs in artificial testing situations return false positives anywhere from 12.5% to 60% of the time,   depending on the length of the search. See Reply Brief   for Petitioner 13; Federal Aviation Admin., K. Garner   et. al., Duty Cycle of the Detector Dog: A   Baseline   Study 12 (Apr. 2001) (Prepared by Auburn U. Inst. for Biological Detection Systems).   In practical terms, the evidence is clear that the dog that alerts hundreds of times will be wrong dozens of times.

Id. 543 U.S. at 411-412.  Although Justice Souter recognizes that the alert of a drug dog will not necessarily reveal hidden contraband, "this is not, of course, to deny that a dog's reaction may provide reasonable suspicion, or probable cause, to search the container or enclosure; the Fourth Amendment does not demand certainty of success to justify a search for evidence or contraband."  Id. at 412-413.  Proof beyond a reasonable doubt in a criminal trial, as is demanded in United States of America v. Wilson Lee Garrett, Jr., does, however, require a level of certainty substantially higher than reasonable suspicion or probable cause.

In our case, the Government has provided notice that it will have the handlers of two (2) drug dogs testify.  The first handler will testify that a drug dog hit on the dashboard of Wilson Garrett, Jr.'s car at the time of the March 18, 2009 traffic stop and on the cash seized from him at the traffic stop.  The name of this first drug dog is "Prospect" and his handler would be Cpl. Scarlotta of the Prince George's County

Police Department, Narcotics Enforcement Division.

The other handler is going to be Charles County Sheriff's Deputy Mark Davidson, a so-called certified canine handler, with his dog "Hugo". According to the DEA form provided in discovery, "Hugo" positively alerted to the presence of narcotics at five (5) separate locations within Mr. Garrett's home: two separate locations within the master bedroom; one location in each of the two upstairs, spare bedrooms; and one location in the basement. This is the sum total of the notice we have been given by the Government as to the so-called positive alerts.

There are numerous problems with this evidence coming before a jury substantively as proof of the possession of narcotics. First of all, it is well-known that drug dogs are not actually alerting to cocaine but a substance known as methyl benzoate which is found in many ordinary household items, as well as cocaine. (See generally notes 32 through 38 and references therein in Oregon Law Review, 88 Or.L.Rev. 829 (2009), Article, "Has the Fourth Amendment Gone to the Dogs?: Unreasonable Expansion of Canine Sniff Doctrine to Include Sniffs of the Home"). In a civil asset forfeiture case in the United States District Court for the District of Arizona, the court granted the claimant's motion for summary judgment against the United States' forfeiture of $32,000.00 in U.S.

currency, noting the misplaced reliance on drug dog sniff
evidence the Government makes in its effort to sustain the
forfeiture of the $32,000.00 in question.

> The Government relies on Ninth Circuit cases that have
> held that dog alerts provide a strong basis for connecting
> the currency to illegal drugs.  Id. (citing Currency,
> U.S., $42,500, 283 F.3d at 982 (9th Cir.2002); United
> States v. $22,474 in U.S. Currency, 246 F.3d 1212, 1216
> (9th Cir. 2001).  In these cases, however, the dogs alerted
> not to the scent of drugs on money, but to the scent of
> transient by-products of illegal drugs.  The Ninth Circuit
> has given weight to such evidence because these
> sophisticated dog alerts indicate that the money has been
> in recent contact with illegal drugs.
>
> Less sophisticated dog alerts have been given little
> weight because studies show, regrettably, that a large
> percentage of the nation's money is contaminated with
> illegal drugs.  United States v. U.S. Currency $30,600.00,
> 39 F.3d 1039, 1042 (9th Cir. 1994).  The Ninth Circuit has
> held that such non-sophisticated dog alerts are of very
> little probative value.  United States v. $49,576.00 U.S.
> Currency, 116 F3d 425, 427 (9th Cir. 1997).  The Government
> has not shown that this case involves a sophisticated dog
> alert that would detect only transient by-products of
> illegal drugs.

United States v. $32,000.00 in U.S. Currency, 2007 WL 1297098,

page 4(D.Ariz.)  Both Cpl. Scarlotta and Deputy Davidson, the

two drug dog handlers the Government wishes to testify in this

case, may be part-time certified canine officers as part of

their general law enforcement responsibilities, but the alerts

in this case do not appear at all sophisticated, able to

decipher which drugs were alerted to, if any at all, and they

have certainly not been shown to be qualified to discuss

whether the dog was alerting to cocaine hydrochloride or methyl

benzoate. While their dogs' alerts may be sufficient for probable cause purposes, as seen below, their conclusions may be tainted by handler subjectivity.

In addition, the problems with drug dogs alerting to cash have been well documented in studies and case law. Judge Nathaniel R. Jones and Judge J. Moore writing a concurring opinion in United States v. Buchanan IV, 213 F.3d 302, 315, (6th Cir. 2000), write compellingly about the dubiousness of drug sniff evidence, especially as it relates to positive alerts on U.S. currency.

> ...we write separately because we are persuaded by
> Murray's and Washpun's argument that the officer testimony
> that trained canines reacted positively to currency found
> on them should have been ruled inadmissible. Both
> defendants contend that this "dog-sniff" evidence is
> inherently unreliable because it does not necessarily
> indicate drug activity on their part, citing studies
> finding that anywhere from seventy to ninety-six percent
> of United States currency is tainted with narcotics. FN1
> They presented these statistics to the district court
> through their motions in limine and oral arguments, as
> well as through voir dire of government witnesses.
>
> We agree that this dog-sniff evidence was inherently
> unreliable and that the court abused its discretion in ad-
> mitting it. In recent years, this court and others have
> expressed skepticism regarding the probative value of
> evidence that a dog detected narcotics traces on currency.
> FN2 In United States v. $5,000 in United States Currency,
> 40 F.3d 846 (6th Cir. 1994), this court held that the
> evidentiary value of the narcotics dog's alert was
> minimal, and "insufficiently indicative of probable
> cause." Id. at 848-49. The court cited cases and studies
> indicating that up to ninety percent or more of bills test
> positive for traces of cocaine. See id. at 849. This
> conclusion followed a previous panel which had found that
> similar dog-sniff evidence had only weak probative value.
> See United States v. $53,082.00 in United States

Currency, 985 F.2d 245, 250 N.5 (6TH Cir. 1993). Other circuits have similarly doubted the utility of such evidence. *See, e.g., United States Currency, $30,060.00,* F.3d at 1043 (concluding that statistics showing widespread currency contamination greatly diminishes the probative value of positive dog sniffs of money, and that continued reliance of courts and law enforcement officers on such evidence is "logically indefensible") (citation omitted); United States v. $191,910.00 in United States Currency, 16 F.3d 1951, 1962 n, 21 (9th Cir 1994)(noting that "[i]n recent years, courts have increasingly questioned the reliability of dog alerts" on currency); Jones v. Drug Enforcement Administration, 819 F.Supp. 698, 719, 720 (M.D.Tenn. 1993) (concluding that because contaminated currency is widespread, evidence of a "narcotic-trained dog's 'alert' to the currency is of extremely little probative weight").

> FN[1]. Defendants cite two reasons that such a large percentage of currency is tainted with narcotics. First, when currency is run through a mechanized counter at a bank, narcotics contained on some of the currency gets into the counter and is transferred to other currency. Second, the ink on currency bonds with the narcotics. This argument echoes other courts' and studies' conclusions regarding "contaminated" money. *See, e.g., United State v. United States Currency, $30,060.00,* 39 F.3d 1039, 1043 (9th Cir. 1994).

> FN[2]. The issue of the reliability of dog-sniff evidence emerges in two different contexts: 1) as here, whether it should be allowed as evidence, and 2) whether it is sufficiently indicative of probable cause.

U.S. v. Buchanan, 213 F.3d at 315.

We are fortunate to be discussing this issue at a time when a new, comprehensive study has just been released by the Departments of Neurology, Psychiatry, and Animal Science, at the University of California at Davis, concluding that,

overwhelmingly, handlers' beliefs affected the outcome of dog alerts as opposed to the influences of the abilities of the dogs themselves.  The number of incorrect responses by the dogs in the study was overwhelming, casting doubt not only on the use of drug dogs in any substantive manner in a criminal trial, but even casting doubt on the validity of their use for purposes of probable cause determinations.  We have provided, as attachment #1, this study published by several Ph.D.'s in the Departments of Neurology, Psychiatry, and Animal Science at the University of California, at Davis.  The study was published on-line on January 12, 2011.  We have also provided, as attachment #2, an article that puts this University of California study in the context of other works that have discussed police dog accuracy.

The bottom line is that Wilson Garrett, Jr., did not in this case challenge the use of the drug dogs to determine the issue of probable cause at the time of the traffic stop or at the time the police conducted the search of his home on May 15, 2009.  When it comes to the Government at trial trying to prove his possession of cocaine in his car or on his person at the time of the March 18, 2009 traffic stop, or in his home at the time of the May 15, 2009 search warrant, however, the story is entirely different.  We urge the court to preclude the Government's use of drug dog sniff evidence in the trial of the

above captioned case.

## RULE 404(b) EVIDENCE

The Government posits four (4) potential items it may introduce as Rule 404(b) evidence. The first of those is "The Defendant's Drug Dealing Outside of the Conspiracy Period". The Government's main informant is David Zellars, who will testify purportedly that Mr. Garrett has some connection to the February 13, 2007 seizure of 70 kilos of cocaine, taken from Mr. Zellars and several other individuals during a traffic stop of three (3) vehicles in a caravan. Mr. Zellars will also purportedly discuss that prior to February 13, 2007, during the period charged in count 1 of the Indictment, namely the middle of 2006 through February, 2007, that he engaged in multiple transactions with Wilson Garrett, Jr.  Should, however, the Government attempt to use Mr. Zellars or other informants that purport to discuss their dealings with Mr. Garrett regarding drug transactions having nothing to do with David Zellars, or which are outside of the charged period in any of the four (4) counts of the Indictment, then we would submit that such testimony would not meet the test for admissibility of Rule 404(b) evidence.

The test for admissibility of Rule 404(b) evidence was

recently articulated in <u>United States v. Cole</u>, 631 F.3d 146,
153-154 (4th Cir. 2011).

> As we recognized in <u>United States v. Queen</u>, 132 F.3d 991,
> 995 (4th Cir. 1997), this court has been less than
> consistent in its application of Rule 404(b).  But on the
> whole, "we have construed the exceptions to the
> inadmissibility of prior bad acts evidence broadly, and
> characterize Rule 404(b) as an inclusive rule, admitting
> all evidence of other crimes or acts except that which
> tends to prove only criminal disposition."  <u>United States
> v. Powers</u>, 59 F.3d 1460, 1464 (4th Cir. 1995) (internal
> quotation marks omitted).  And we have set out a four-
> part test for prior-act evidence:
>> (1)  The evidence must be relevant to an issue,
>> such as an element of an offense, and must not be
>> offered to establish the general character of the
>> defendant.  In this regard, the more similar the
>> prior act is (in terms of physical similarity or
>> mental state) to the act being proved, the more
>> relevant it becomes.  (2) The act must be necessary
>> in the sense that it is probative of an essential
>> claim or an element of the offense. (3)  The evidence
>> must be reliable.  And (4) the evidence's probative
>> value must not be substantially outweighed by
>> confusion or unfair prejudice in the sense that it
>> tends to subordinate reason to emotion in the
>> factfinding process.
>
> <u>United States v. Johnson</u>, 617 F.3d 285,296-97 (4th Cir.
> 2010)(quoting <u>Queen</u>, 132 F.3d at 997).  Parts (1)-(3)of
> the <u>Queen</u> test are requirements that must be satisfied for
> admission, but they also double as factors to be
> considered as probative value is weighed against unfair
> prejudice in the bundled Rule 403 analysis of part (4).

<u>Id</u>.  Moreover, because of the danger that this evidence will be
viewed by a jury as reflective of a defendant's "propensity,
disposition or bad character, the probative value must be
carefully evaluated relative to other considerations necessary
to preserve the integrity of the trial process and its

fundamental premise that a defendant will be tried only for the crime charged," United States v. Heller, 2010 WL 4961661, page 3, (E.D.Va. 2010)).

The 4th Circuit recognizes particular concerns when the proffered other crimes evidence is of the same general nature, i.e., prior illegal drug transactions, as to the crime charged.

> In order for evidence of prior drug transactions to be admissible in a drug conspiracy case, the prior acts must be relevant to the charged offense. Thus, we have repeatedly found that the prior act which is alleged to be probative of an element of the crime must be "sufficiently related to the charged offense." Mark, 943 F.2d at 448 (internal quotation marks omitted) (quoting United States v. Rawle, 845 F.2d 1244, 1247 n. 3 (4th Cir. 1988)); Hernandez, 975 F.2d at 1039. Therefore, the more closely the prior act is related to the charged conduct-either in time, pattern, or state of mind-the more probative it is of the defendant's intent or knowledge in relation to the charged conduct. See Rawle, 845 F.2d at 1247; Mark, 943 F.2d at 448; Hernandez, 975 F.2d at 1039. The fact that a defendant may have been involved in drug activity in the past does not in and or itself provide a sufficient nexus to the charged conduct where the prior activity is not related in time, manner, place, or pattern of conduct.

United States v. Johnson, 617 F.3d 286, 297 (4th Cir.2010).

The Johnson decision discussed several prior decisions in the Circuit such as United States v. Rawle, 845 F.2d 1244 (4th Cir.1988), where the other crimes' evidence was properly introduced under the "knowledge, common scheme, or plan" prong of the test, where both the prior act and the charged crime involved Rawle transporting marijuana on I-95 in an empty tractor trailer and in each case placed paper products in the

back of the trailer, and created false bills of lading to conceal the contraband, Id. at 297.  In another case, United States v. Mark, 943 F.2d 444 (4th Cir.1991), Marks prior drug transactions occurred in the same state and during the same year he was arrested in the charged offense, and testified in his defense about a purportedly innocuous relationship to the co-defendants.  Mark, 943 F.2d at 448.  The other crimes evidence, however, linked Marks to his co-defendants by showing that he was a major cocaine distributor with the co-defendants and not just an innocent friend.  Id. at 446-448.  In United States v. Hernandez, 975 F.2d 1035 (4th Cir. 1992), on the other hand, the proffered other crimes evidence was not allowed because it only bore a slight relationship to the charged crime.  Id. at 1040.  The witness in Hernandez testified regarding the defendant's prior statements about a recipe for cooking drugs and then re-selling them in New York.  Hernandez, however, was charged with conspiracy to distribute drugs in the Washington, D.C. area, and having denied involvement in the conspiracy, the court found the proffered other crimes testimony did not illustrate anything regarding her intent to sell drugs in D.C..  Nor was it closely related in time or place to the charged offense.  Id. at 1039.

In United States v. Johnson, supra, the 4th Circuit reversed Walter Johnson's conviction for conspiracy to possess

with intent to distribute cocaine.   617 F.3d 286, 299.   The
informant against Johnson, someone named "Timpson" testified he
engaged in transactions with Johnson in 1998 which was nearly
five (5) years before the charged conspiracy allegedly began in
the case.   Id. at 298.   The Johnson court found that the
testimony was remote in time and Timpson did not link Johnson
to any of the other co-defendants, contrasting the Mark case,
supra, where "the trial court pointed out that the evidence of
prior bad acts disclosed how the defendant got the drugs that
he was charged with selling", and finding that no "such nexus
can be found in Timpson's testimony." Id.   The court also
noted that the informant Timpson merely described the
transactions that he purportedly conducted with defendant,
Johnson, and that they did not either directly or indirectly
relate to the charged conspiracy.   Id. Even the manner of how
the prior drug transaction went down did not relate to the
manner in which the charged drug transaction Johnson proceeded,
so the prior acts did not fit within the circumstance that
allowed the prior bad acts to be admitted in Rawle.   Id.

     In our case, the Government provided a letter dated
February 14, 2011, outlining so-called Jencks, and Giglio
material that it may offer in our case.  The primary informant,
as stated, is David Zellars, who would purportedly testify that
he began a relationship consisting of drug transactions with

Wilson Garrett, Jr., in the spring or summer of 2006, up and through February of 2007, when the seventy (70) kilo seizure occurred. Then, based on available discovery there does not appear to be any contact on or after February 13, 2007, until 2009 when the series of meetings and telephone calls take place between Mr. Zellars and Wilson Garrett, Jr., culminating in the March 18, 2009, traffic stop.

In addition, to Zellars' testimony, however, the Government indicates it may call one Laray Maddox. The Government's February 14, 2011 letter indicates at some unknown time, possibly in 2008 based on the chronology outlined in the letter, that on two (2) occasions Maddox travelled with someone named Tyron Butler to meet a subject named, "B", purportedly Wilson Garrett, Jr., at a Lefties Barbeque restaurant in Waldorf, Maryland. At that time, Butler purportedly obtained some unknown amount of cocaine from Garrett Wilson, Jr., who was driving a green mini-van. That is the sum and substance of what the Government told us is its purported other acts evidence as to Laray Maddox. This information appears to be outside of the charged conspiracy period, is vague, bears no relationship to any transaction with David Zellars, is in an amount dramatically different than what Zellars indicates he was transacting with Wilson Garrett, Jr., (multiple kilos at a time) and comes from a source, Laray Maddox, who not only is a

testifying cooperator seeking to earn downward departure points under U.S.S.G., Section 5K, but whose statement of facts does not mention David Zellars.  Nor does David Zellars' statement of facts and its recitation of approximately seventeen (17) co-conspirators mention any connection with Laray Maddox.  For all these reasons, the testimony of Laray Maddox does not appear to be relevant, nor probative of any element of the offense, nor is such testimony reliable, and the testimony certainly seems to constitute propensity evidence and evidence without much of a foundation.

The Government will purportedly call James Shade, who is also referenced in their letter of February 14, 2011, to testify.  He will state that at some unidentified period of time, apparently subsequent to January, 2008, when Mr. Shade was released from jail, that Shade accompanied this Tyron Butler, when Butler met with "B".  Butler purportedly obtained a 62 gram quantity of cocaine for himself and a 62 gram quantity for Shade, with "B" being identified as Wilson Lee Garrett, Jr.  For the same reasons as to Mr. Maddox, this drug transaction, apparently outside of the charge conspiracy period, does not appear related to the conspiracy charged as to David Zellars, does not have the same amount or *modus operandi*, in terms of the nature of the transaction, does not appear to share participants in terms of the seventeen (17) mentioned co-

conspirators in David Zellars factual recitation in his plea agreement, and does not appear to meet the stringent test for admissibility as set forth in the above cases.

Lastly, the Government indicated it may call Tyron Butler, who will testify he purportedly began purchasing 62 gram quantities of cocaine from Wilson Garrett, Jr. in 2004, as recited in the Government's letter of February 14, 2011. Butler then will apparently claim he purchased the said quantities about ten (10) times, moved up to four and a half ounce quantities and ultimately purchased a quarter kilogram from Wilson Garrett, Jr. approximately three (3) times. Other than mention of the beginning date in 2004, these other transactions were not specified in terms of their dates. Obviously, based on a recitation of the above cases, in particular United States v. Johnson, supra, where a five (5) year period between the other crime and charged crime was found to be too remote under the standards for admissibility of 404(b) evidence, testimony about Mr. Garrett's purported transactions in 2004, are arguably too remote not only in time to the charged offenses, but as was the case with Maddox and Shade, bear no connection to Zellars' transactions, in the amount that was purportedly transacted, the persons involved, the lack of connection to members of Zellars' large group of co-conspirators, or in any other manner appear connected to

what Zellars' testimony will be about his involvement with Wilson Garrett, Jr.  For all of these reasons, the Government's purported other acts evidence as to drug transactions purportedly engaged in by Wilson Garrett, Jr. outside of the charged time period, should be ruled inadmissible in the trial in this case.

The second purported Rule 404(b) item on the Government's list is "the defendant's commission of bank and wire fraud". Mr. Garrett has not been charged with any bank or wire fraud. While we have been given some documentation regarding his application for a refinancing loan, and some possibly altered pay stubs and W-2's he had in his files, it is not clear that he committed or attempted to commit any bank and wire fraud. Not only does the evidence appear to be remote in time and outside of the charged time period, it does not relate to the drug charges involved in this case.  The documents were not shown to have been submitted for purposes of obtaining a loan. The Government's attempted proof of bank and wire fraud would basically denigrate into a mini-trial which would confuse and mislead the jurors, and be contrary to the general principles of relevance as outlined in Rule 403.  The evidence appears less than reliable that there was any such fraud and its purpose can only be to paint Mr. Garrett in a very negative light before the jury about an allegation completely unrelated

to the case at hand.

The third item in the Government's purported Rule 404(b) proffer is "the defendant's tax evasion", per the April 7, 2011 letter of the Government. Not only has Mr. Garrett not been charged with tax evasion, and though we have most of his tax returns for the last several years, it is not clear to us what tax evasion the Government is referring to, what year, how much evasion, and what bearing such an amorphous allegation has on the nature of this drug conspiracy case. It has none, to put it bluntly. We do not see any evidence of tax evasion, and if there were some tax improprieties, we suggest to the court that this would create again a side trial requiring tax experts or accountants and would lead to confusion of the issues before the jury on an irrelevant matter, which would further distract the jury, cause confusion and waste of time, and tend to paint Mr. Garrett in a negative light.

Lastly, the Government posits Mr. Garrett's prior possession of a firearm at a military base. This incident is the only incident for which Mr. Garrett actually has been charged in the past which stems from an arrest of Mr. Garrett on August 14, 2003. A loaded weapon was found in Mr. Garrett's glove box in his vehicle as he was attempting entry onto the base at Fort Myer, Virginia. He apparently was found guilty of carrying a concealed weapon. This offense has absolutely

nothing to do with the charged offense, occurred approximately four (4) years prior to the start of the alleged conspiracy period in count 1, and six (6) years before the firearm charge in count 4 of the superseding Indictment. It bears no relationship to any of the charged offenses, it is not relevant to any of the issues, and it is not probative of any element of the offense. About the only part of the prior bad acts test that the evidence meets is that the evidence does appear to be reliable. The probative value of the evidence, however, is nil and it is certainly substantially outweighed by confusion, unfair, prejudice and its overwhelming tendency to paint Mr. Garrett in a negative light before the factfinder. Consequently, the evidence of this latter item should not be admitted at the trial in this case.

## CONCLUSION

For all of the foregoing reasons, and additional reasons to be adduced at the hearing on this Motion, the evidence the Government intends to use as to the drug sniffing dog at the March 18, 2009, traffic stop and the May 15, 2009, search warrant as well as the purported Rule 404(b) evidence in the form of uncharged drug transactions outside of the relevant conspiracy period as well as purported tax evasion, bank and wire fraud, and a prior gun charge from 2003, should all be ruled inadmissible and we urge the Court to grant the Motion *In*

*Limine* in this matter.

Respectfully submitted,

-S-

_____
JAMES N. PAPIRMEISTER, ESQUIRE
LAW OFFICES OF JAMES N. PAPIRMEISTER
**ATTORNEY FOR DEFENDANT**
8630 Fenton Street, Suite 320
Silver Spring, Maryland 20910
(301) 589-2100
Bar No. 10789

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Consolidated Motion In Limine, was sent this _____ day of April, 2011, via ECF, Assistant United States Attorneys, Christen Sproule and James Crowell, United States Attorney's Office, 6500 Cherrywood Lane, Greenbelt, Maryland 20770.

-S-

_____
JAMES N. PAPIRMEISTER, ESQUIRE
**ATTORNEY FOR DEFENDANT**